IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,　　　:
　　　Plaintiff,
　　　　　　　　　　　　　　　　　　 Case No. 3:16-cr-99(2)
v.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　 JUDGE WALTER H. RICE
PEDRO DOMINGUEZ-VILLA,
　　　Defendant.　　　　　　　　:

---

DECISION AND ENTRY OVERRULING DEFENDANT PEDRO
DOMINGUEZ-VILLA'S MOTION TO SUPPRESS EVIDENCE AND
STATEMENTS (DOC. #16); EVIDENCE SEIZED FROM DEFENDANT'S
VEHICLE AND STATEMENTS MADE BY DEFENDANT TO LAW
ENFORCEMENT MAY BE USED AGAINST HIM AT TRIAL

---

Defendant Pedro Dominguez-Villa ("Defendant") was charged with conspiracy to possess with intent to distribute five kilograms or more of cocaine, conspiracy to possess with intent to distribute cocaine, and possession with intent to distribute cocaine. This matter is currently before the Court on Defendant's Motion to Suppress Evidence and Statements ("Motion"). Doc. #16. The Court held a hearing on same on November 8, 2016. For the reasons set forth below, the Court overrules the Motion.

I. **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On June 28, 2016, Homeland Security Investigations ("HSI"), Immigrations and Customs Enforcement Special Agent Brian Turk ("Turk") filed a criminal complaint against Defendant. Doc. #1, PAGEID #1. In the complaint, Turk attested to his belief that Defendant conspired "to possess with the intent to distribute and to distribute [five]

or more kilograms of cocaine." *Id*. In his supporting affidavit, Turk stated that on June 28, 2016, agents for the HSI Bulk Smuggling Task Force ("Task Force") were "conducting investigative operations in a drug trafficking area", and observed a "green Chrysler minivan, Ohio registration GES4696, leaving a trailer park" located in that area. Doc. #1, ¶ 2, PAGEID #4. The agents checked the registration of the vehicle and "learned the vehicle was registered to [a] Pedro Dominguez." *Id*. The agents followed a man (who was in fact the Defendant) as he drove away from the area. As the agents were following him, one of the agents observed that Defendant "was driving in a manner consistent with illegal activity." *Id*., ¶ 3. Specifically, an agent observed Defendant "mak[ing] abrupt turns/U turns in an attempt to [']clean himself[']" *id*.—"a common tactic that drug dealers used to . . . shake[] law enforcement surveillance." Doc. #25, PAGEID #196.

After driving away, Defendant stopped at a residence for approximately seven minutes; Turk averred that, from his experience, "short term vehicular and foot traffic" at a particular location "are indicative of illegal activity[,] including but not limited to drug trafficking." Doc. #1, ¶ 5, PAGEID #5. After Defendant left the residence, Task Force agents relayed Defendant's information to Ohio State Highway Patrol ("OSHP") Sergeant Trooper Chris Coverstone ("Trooper 1"), "who was in the area assisting with the surveillance." *Id*. Trooper 1 began trailing the minivan, at which point Defendant slowed from sixty to thirty-eight miles per hour, despite the speed limit being fifty-five miles per hour and despite Trooper 1 giving no indication (*e.g.*, flashing his siren) that he intended to initiate a traffic stop; Trooper 1 testified that Defendant's slowing down under the circumstances was "highly unusual." Doc. #20, PAGEID #125.

2

As he drew closer to Defendant's vehicle, Trooper 1 observed that the minivan's back license plate did not properly display the registration stickers, a violation of Ohio traffic law. *Id.*, PAGEID #123-24. Trooper 1 then initiated a traffic stop, having radioed OSHP Trooper Jason Barhorst ("Trooper 2"), who was with his state certified K-9 partner ("Roy"), to request assistance. *Id.*, PAGEID #121. When Trooper 1 reached Defendant's window, Trooper 1 made the following observations, each of which was consistent with an individual trafficking drugs: the minivan had many air fresheners inside; Defendant's keyring only had the key to the minivan; and Defendant was shaking "pretty badly" and seemed frantic. *Id.*, PAGEID #127-28.

After Trooper 1 obtained Defendant's driver's license, Trooper 1 asked Defendant to step out of the minivan. Trooper 1 conducted a pat-down search for weapons out of concern for officer safety and had Defendant sit in the back of his cruiser. Defendant was not handcuffed at this time. Doc. #20, PAGEID #130, 135. While Trooper 1 was running Defendant's driver's license and registration information and working on paperwork to issue the citation, Trooper 2 and Roy arrived, and Trooper 1 asked Trooper 2 to "run" Roy—that is, to conduct a free-air sniff around the minivan. *Id.*, PAGEID #131. Roy alerted Trooper 2 to the scent of narcotics; consequently, Trooper 1 searched the minivan for contraband. *Id.*, PAGEID #133. Trooper 1 discovered that approximately 650 grams of cocaine were in a shoebox on the front passenger seat and in a thermos located in the middle area. A digital scale was also found inside of the thermos. *Id.*, PAGEID #134, 136. After completing the search, Trooper 1 handcuffed Defendant and transported him in Trooper 1's cruiser to the Montgomery County, Ohio, Sherriff's Office for questioning. Trooper 1 did not question

3

Defendant during the drive. As Defendant was being removed from Trooper 1's cruiser, Trooper 1 found a bag of cocaine where Defendant had been sitting. *Id.*, PAGEID #136.

At the Sherriff's Office, Defendant was placed in an interview room. Defendant sat on one end of the interview table, closest to the door, and Detective Josh Walters ("Walters") sat at the other end of the table. Detective Jorge Delrio ("Delrio") sat in the middle of the table so that he could translate from English to Spanish (Defendant's native language), and vice versa. Doc. #20, PAGEID #156. Neither detective displayed a weapon during the interview. *Id*. Prior to being provided with the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.E.d.2d 694 (1966), Walters asked Defendant biographical questions necessary for booking. Doc. #20, PAGEID #157. Walters also told the Defendant that "he knew what [Defendant] was doing", and that "it would behoove him to cooperate at this point in this investigation." *Id*. Walters also stated that he and Delrio wanted to ask Defendant "some questions, but before we did[,] we'd have to read him his rights." *Id*. After Delrio confirmed that he and the Defendant understood each other, Delrio provided him with written, Spanish-language *Miranda* warnings. *Id.*, PAGEID #159. Delrio then provided the warnings verbally because, although Defendant told Delrio that he could read, he also had indicated that he had only received a sixth grade education. *Id.*, PAGEID #168-69.

Defendant indicated that he understood Delrio and his rights by initialing next to each section of the *Miranda* warnings. Doc. #20, PAGEID #160. Delrio then read the provision by which the Defendant agreed to waive his *Miranda* rights; the Defendant, after indicating that he understood the waiver, signed the document. *Id.*, PAGEID #162.

After signing the waiver, the Defendant admitted to Walters and Delrio that he had been trafficking cocaine. *Id.*, PAGEID #163-64.

Defendant was indicted by on July 12, 2016, on the charges of: (1) conspiring "to possess with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine," in violation of 21 U.S.C. §§ 841(b)(1)(a), 846. Doc. #14, PAGEID #67; (2) conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(C), 846. *Id.*, PAGEID #68; and (3) possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). *Id.*

On September 4, 2016, Defendant filed the instant Motion, seeking to "suppress[] all evidence obtained by the Government in the above captioned matter and any statements made by [him]." Doc. #16, PAGEID #72. He argued that the evidence was "seized in violation of his constitutional right to be free from unreasonable search and seizure, as well as self-incrimination guaranteed by the Fourth and Fifth Amendments of the United States Constitution." *Id.* An evidentiary hearing was held on November 8, 2016, Doc. #19, and Defendant and Plaintiff, the United States of America ("the Government"), submitted post-hearing briefs. Docs. #21, 25.[1]

---

[1] On November 8, 2016, the Court directed the parties to file simultaneous briefs twenty-one days after the transcript was released, with response briefs due fourteen days after the filing of the initial briefs. Doc. #20. Defendant filed Defendant's Brief in Support of motion to Suppress Traffic Stop, Inventory of Vehicle, and Statements on November 30, 2016. Doc. #21. The Government filed a Motion to Continue in Filing its Opening Brief in Opposition to the Motion to Suppress Traffic Stop on December 13, 2016. Doc. #22. The Court sustained the motion on December 14, 2016. The Government filed another Motion to Continue the briefing schedule on December 20, 2016. Doc. #24. The Court sustained the motion on December 21, 2016. The Government filed its Opposition to Defendant's Motion to Suppress on December 23, 2016. Doc. #25. Neither party responded to the other party's brief within the allotted fourteen day timeframe.

II.   **LEGAL STANDARDS**

The Fourth Amendment to the United States Constitution establishes the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). Two well-established doctrines protect this right. First, the exclusionary rule "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Second, pursuant to the "fruit of the poisonous tree" doctrine, all derivative evidence flowing from an illegal search or seizure is also usually excluded. *U.S. v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005).

The Fifth Amendment to the United States Constitution prohibits law enforcement from compelling a person to incriminate himself. U.S. Const. amend. V. However, a person may waive her Fifth Amendment rights, so long as that waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444-45. The voluntariness of a waiver and subsequent confession is assessed based on the totality of the circumstances; a waiver and subsequent confession are involuntary if: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *U.S. v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (quoting *U.S. v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

"To determine whether a waiver was knowing and intelligent, a court should consider the totality of the circumstances—'the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.'" *Barksdale*, 832 F. Supp. 2d at 845 (S.D. Ohio 2011) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009)). A waiver and confession are voluntary if the person "knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *U.S. v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (internal quotation marks omitted) (citing *U.S. v. Lawrence*, 735 F.3d 385, 436-37 (6th Cir. 2013); *Garner*, 557 F.3d at 261).

### III. ANALYSIS

Defendant argues that the evidence and statements made should be suppressed because (A) the traffic stop detention and duration was not justified by reasonable suspicion, (B) that there was no probable cause for the search of his minivan, and (C) that his statements should be suppressed because his waiver was ineffective. Doc. #16, PAGEID #73-74. The Court addresses his arguments in turn.

### A.    Probable Cause Existed for Traffic Stop

Defendant contends that there was not probable cause for the traffic stop, arguing that, instead, "the stop resulted from a suspicion – not evidence – of drug trafficking. No consistent version of a traffic violation exists to warrant the police to initiate the stop of Defendant." Doc. #21, PAGEID #182. The decision to stop an automobile without a warrant is reasonable where the police have probable cause to

7

believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996); *Delaware* v. *Prouse*, 440 U.S. 648, 659, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *Pennsylvania* v. *Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) *(per curiam)*. Caselaw has foreclosed "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"; as long as an officer observes a traffic violation, a subsequent stop of the vehicle is constitutionally permissible. *Whren*, 517 U.S. at 813. It is a traffic violation under Ohio law to "fail to display in plain view . . . any county identification sticker and any validation sticker issued under . . . the Revised Code." Ohio Rev. Code § 4503.21(A). Ohio law further requires a validation sticker to be displayed on the "on the rear license plate." *Id*.

Trooper 1 testified that he observed Defendant's license plate, and that the registration stickers were obscured by the license plate frame, Doc. #20, PAGEID #123-24, a violation which made his decision to stop Defendant's vehicle reasonable. Trooper 1, in fact, did stop Defendant's minivan for this traffic violation, as evidenced by the citation Trooper 1 issued to Defendant and the picture of Defendant's license plate. Trooper 1 made these observations and signed the citation for it. Thus, there is a consistent version of the traffic violation that provided probable cause for the stop. *Id*., PAGEID #137 (citation omitted). Even assuming *arguendo* that the improper placement of the registration stickers was mere pretext for Trooper 1's true motivation for the stop—suspicion of drug activity—such pretext is immaterial to determining whether probable cause existed to initiate the traffic stop. *Whren*, 517 U.S. at 813. For the

8

reasons set forth above, probable cause undoubtedly existed, and Defendant's first argument is overruled.

### B. Probable Cause Existed to Search Defendant's Vehicle

Defendant contends that there was not probable cause for the search of the vehicle as an inventory search or as a search incident to his arrest, and thus, the cocaine seized by Trooper 1 must be suppressed as the fruit of an unlawful search. Doc. #21, PAGEID #183.

"An individual's [Fourth Amendment reasonable] expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." *U.S. v. Ross*, 456 U.S. 798, 823, 102 S. Ct. 2157, 72 L. Ed.2d 572 (1982). "[A]n alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle." *U.S. v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005).

> [T]he Fourth Amendment is not implicated, when a drug detection dog is walked around the exterior of a vehicle, sniffs the car and alerts on it, indicating that controlled substances are located therein, as long as the vehicle was lawfully stopped and the actions of the drug detection dog did not extend the stop.

*U.S. v. Aguando-Garcia*, No. 3:09-cr-175, 2010 WL 3769107, at *4 (S.D. Ohio Sep. 27, 2010) (Rice, J.) (citing *Caballes*, 543 U.S. at 407).

9

As discussed above, there was probable cause for the initial stop of Defendant's minivan. During the suppression hearing, the parties stipulated that Trooper 2 deployed Roy, a certified trained narcotics dog, and that Roy alerted Troopers 1 and 2 to the presence of narcotics in Defendant's minivan during the course of the stop. Doc. #20, PAGEID #153. Defendant does not claim, in his Motion or post-hearing brief, that Roy's free-air sniff extended the stop past the timeframe reasonably necessary to issue a citation; indeed, only eight minutes elapsed between the initiation of the stop and Roy alerting the Troopers to narcotics in the minivan. *Id.*, PAGEID #133-34. Once Roy alerted the Troopers to the presence of narcotics, probable cause existed to conduct a warrantless search of the vehicle, *Hill*, 195 F.3d at 273, and the search was reasonable regardless of whether Defendant was ultimately arrested or the minivan was ultimately impounded. Moreover, Trooper 1 discovered the cocaine at issue prior to placing Defendant under arrest or conducting an inventory of the minivan. Doc. #20, PAGEID #134. Accordingly, the inventory search and search incident to arrest exceptions to the Fourth Amendment are not implicated, and the Court overrules Defendant's Motion as it relates to the cocaine seized from the minivan.[2]

---

[2] Also, Trooper 1 cited Defendant, the only person in the minivan, for driving with an expired license; at that point, "he legally could not leave in the van." Doc. #20, PAGEID #131. As the stop occurred on a busy highway, the minivan needed to be towed. *Id.*, PAGEID #132. Trooper 1 testified that OHSP policy dictates that, prior to towing and impounding a vehicle, "[w]e will conduct a written inventory" of it. *Id.* Such an inventory search may be conducted without a warrant, for, among other purposes, itemizing and securing a vehicle's contents. *South Dakota v. Opperman*, 428 U.S. 364, 369-71, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *U.S. v. Ballard*, No. 10-3180, 432 F. App'x 553, 556-57 (6th Cir. 2011).
    As most of the cocaine was contained in a shoebox, which sat on top of the front passenger side seat, *id.*, PAGEID #126, Trooper 1 would have discovered the cocaine during the inventory of the vehicle. Thus, even if Roy's free-air sniff unreasonably extended the traffic stop—which it did not—the inevitable discovery exception to the exclusionary rule would apply, and the evidence would not be suppressed. *U.S. v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002).

### C. Incriminating Statements not made in Violation of Fifth Amendment

The parties do not dispute that Defendant's confession, described above, was made in the context of a custodial interrogation. Also, there is no evidence that Walters or Delrio asked Defendant questions that elicited the confession prior to his executing the waiver of his *Miranda* rights. However, Defendant argues that his waiver could not have been knowing, voluntary and intelligent, because it is undisputed that: (1) he has a sixth-grade education; (2) he does not speak English; and (3) prior to being read his *Miranda* warnings, Walters, via Delrio, advised him that "it would behoove" him to cooperate in the investigation. Doc. #21, PAGEID #186. Therefore, Defendant contends, the confession violated *Miranda*, and the statements made during the interrogation should be suppressed as a violation of the Fifth Amendment of the United States Constitution. *Id.*

Delrio, the officer who translated between Walters and the Defendant, testified that he has translated between English speaking law enforcement and Spanish speaking suspects over 100 times. Doc. #20, PAGEID #154-55. He further testified that he did not have a problem communicating with Defendant; nor did Defendant indicate he did not understand anything that Delrio said to him. *Id.*, PAGEID #162. Also, rather than simply relying upon the Defendant to read the *Miranda* warning document (written in Spanish) on his own, Delrio also read each warning to him verbally, to ensure that Defendant understood his rights. *Id.*, PAGEID #159-60. Defendant stated to Delrio that he understood his rights, and he initialed next to each right listed on the document. *Id.*, PAGEID #160. Finally, Defendant signed the waiver after Delrio read it to him. *Id.*, PAGEID #161.

The above-described steps taken by Delrio were more than sufficient to ensure that Defendant, despite his limited education and lack of English proficiency, understood both his *Miranda* rights and the impact of waiving those rights. Thus, Defendant's waiver was knowing and intelligent. Moreover, there is no evidence that force, threat, or intimidation was used by law enforcement to obtain Defendant's confession or the waiver of his *Miranda* warnings, such that the waiver would be considered involuntary; indeed, it is undisputed that, "other than just moving him into the room or escorting him from the room," Walters and Delrio did not even touch Defendant. Doc. #20, PAGEID #163. Defendant was not promised leniency in exchange for waiving his *Miranda* rights, as merely advising a suspect that it would "behoove" him to cooperate does not constitute such a promise or coercion. *Id.*, PAGEID #157. Delrio testified that neither he nor Walters had a firearm visible to Defendant, and that Defendant was seated closest to the door of the interview room. *Id.*, PAGEID #102, 156. Thus, there is no evidence that Defendant's waiver was involuntary, and his confession will not be suppressed.

### IV.     CONCLUSION

For the reasons set forth above, the Court OVERRULES Defendant Pedro Dominguez-Villa's Motion to Suppress Evidence and Statements. Doc. #16. The cocaine seized from Defendant's minivan, and his statements made to Walters and Delrio, may be used against him at trial.

Date: February 14, 2017

_____
WALTER H. RICE
UNITED STATES DISTRICT JUDGE